FILED

03/07/2025

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs February 4, 2025

**STATE OF TENNESSEE v. SONNY EDMUND HUDSON, JR.**

**Appeal from the Circuit Court for Madison County**
**No. 23-346   Joseph T. Howell, Judge**

_____

**No. W2024-01079-CCA-R3-CD**

_____

A Madison County jury convicted the defendant, Sonny Edmund Hudson, Jr., of two counts of attempted first-degree murder and one count of especially aggravated robbery, for which he received an effective sentence of twenty-three years in confinement at 100%.  On appeal, the defendant contends the evidence presented at trial was insufficient to support his conviction for the attempted first-degree murder of James Theus.  After reviewing the record and considering the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which JILL BARTEE AYERS and TOM GREENHOLTZ, JJ., joined.

Samuel W. Hinson, Lexington, Tennessee, for the appellant, Sonny Edmund Hudson, Jr.

Jonathan Skrmetti, Attorney General and Reporter; William C. Lundy, Assistant Attorney General; Jody S. Pickens, District Attorney General; and Justin Prescott, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Facts and Procedural History*

The defendant was charged in a three-count indictment with the attempted first-degree murder of James Theus III, the attempted first-degree murder of Dinarric Woods, and especially aggravated robbery, arising out of the shooting, stabbing, and robbery of the victims.

At trial, Erika Maness testified that, on the evening of September 5, 2022, she, Logan Smith, Destiny Angelusi, and Marley Smith ate dinner at their apartment and "were drinking just a little bit." They were later joined by the defendant, Cody Hall[1], and Damien[2]. At approximately 3:00 a.m., they ran out of alcohol and drove to a nearby Mobil gas station to buy more. After arriving at the Mobil station, Ms. Maness and Damien went inside to purchase the alcohol.

When she exited the gas station, Ms. Maness observed the defendant and Mr. Hall speaking with the victims, Mr. Theus and Mr. Woods. A few minutes later, they followed Mr. Theus and Mr. Woods to the parking lot of the Casey Jones Motel to smoke marijuana. They were "just cutting up, having a good time, just passing [a] blunt around," when Ms. Maness saw the defendant standing between Mr. Theus and Mr. Woods. Ms. Maness saw Mr. Theus touching the defendant "on his penis," so she immediately stood in front of them "as close as [she] could so [Mr. Theus] couldn't touch him anymore." Afterward, "[e]verything went back to normal," and the group of friends left less than five minutes later.

When they arrived back at Ms. Maness's apartment, they woke up Mr. Smith and Ms. Angelusi, who had stayed behind, and discussed what happened to the defendant. Someone retrieved Ms. Maness's gun from her bedroom, and the four men ran to the defendant's vehicle. The women chased after them, and Ms. Maness tried to get her gun back from Mr. Smith; however, she was unsuccessful, and the men drove away.

The women believed the defendant and his friends returned to the Casey Jones Motel because they were "aggravated and frustrated" with Mr. Theus and Mr. Woods. The women drove to the motel, and Ms. Maness tried to convince Mr. Smith to leave. Although Ms. Maness did not speak to the defendant, she told Mr. Smith not to "do anything stupid. Just let it be. Let it go. And just come back home." However, Mr. Smith refused to leave and instead insisted that Ms. Maness leave the motel. Ms. Maness, Ms. Smith, and Ms. Angelusi did not want to leave their friends behind, so they drove to a nearby motel and watched as the defendant and Mr. Smith "walk[ed] to the driver's side of [the defendant's] vehicle, walk[ed] back around, and that's when you heard the gunshots."

Mr. Theus denied inappropriately touching the defendant. According to Mr. Theus, it was the defendant who suggested they meet at the Casey Jones Motel. Mr. Theus testified that he was a "merchandise vendor at the time" and was "always selling something." He stated that he "walked around with a belt filled with fragrance oils, and [he] also sold clothing." On the night of the shooting, Mr. Theus and Mr. Woods attended the African

---

[1] Cody Hall is also referred to as Colby Hall throughout the record.
[2] Damien's last name does not appear in the record.

Street Festival and drove to the Mobil station so Mr. Woods could leave his car parked there for the remainder of the evening. While he and Mr. Woods were at the Mobil station, Mr. Theus was offering his wares to anyone who came by, including the defendant and his friends. According to Mr. Theus, "[t]hey were pretty excited about hearing about it and smelling some of the fragrance oils." He talked to the defendant's group for approximately fifteen minutes, and they "kicked up a comradery" which led to them exchanging contact information. As he and Mr. Woods were leaving the gas station, Mr. Theus noticed the defendant's car parked on the opposite side of the road. The defendant told Mr. Theus to follow him, and Mr. Theus followed the defendant to the Casey Jones Motel. When they arrived, Mr. Theus spoke to two of the men while Mr. Woods spoke to the other two further down the parking lot. A short time later, Mr. Theus heard a gunshot and saw the defendant stab Mr. Woods. Mr. Theus began running, tripped, and fell down, and "then [he] saw [Mr. Smith] turn the gun toward [him] and start shooting." After the defendant, Mr. Smith, Mr. Hall, and Damien fled the scene, Mr. Theus, who had been shot several times, drove to the emergency room. According to Mr. Theus, he stayed in the hospital for thirty days following the shooting and continues to wear a colostomy bag as a result of his injuries. Mr. Theus later discovered that his "Gucci man bag" had been stolen from the front seat of his vehicle immediately following the shooting.

Mr. Woods testified that Mr. Theus sold "cologne and Gucci bags and different little stuff like that" and that he asked the defendant and his friends whether they wanted to buy any of his "product." The defendant indicated that he was interested but stated that he did not have any money with him and told Mr. Theus to meet him at the Casey Jones Motel in an hour. When he and Mr. Theus arrived at the motel an hour later, they parked a few spaces down from the defendant's vehicle. Mr. Theus began showing the men some of the clothing he had for sale, and "everybody was out there having a decent conversation, wasn't no arguing, no fussing, or nothing." A few minutes later, the defendant received a phone call and stated, "Them b*****s calling my phone. I don't want them here." Mr. Woods asked the defendant why he didn't want his friends to come, and the defendant stated that he "just [did not] want them [there]." A short time later, the defendant's friends showed up at the motel, and the defendant repeatedly told them to leave. Mr. Woods did not understand why the defendant's friends could not stay, but the defendant insisted that they leave, and the women complied. Afterward, Mr. Woods observed the defendant and Mr. Smith whispering, and Mr. Woods told Mr. Theus they should leave because "[s]omething [was] funny." A few minutes later, the defendant and Mr. Smith came around the corner from the defendant's vehicle, and the defendant stabbed Mr. Woods in the neck. Mr. Smith shot toward him, and Mr. Woods immediately began running toward the motel next door. As he was running, Mr. Woods saw Mr. Theus trip and fall to the ground. Mr. Smith "was just shooting him and shooting him like he was shooting an animal." When Mr. Woods arrived at the motel, he asked the clerk to call an ambulance and the police.

Although he was initially taken to a local hospital, he was later flown to Vanderbilt due to blood loss.

Officer Tyler Belew with the Jackson Police Department ("JPD") responded to a shots fired call at the Casey Jones Motel and arrived on the scene at approximately 3:45 a.m. Officer Belew observed several drops of blood and learned that one of the victims had driven himself from the motel. As he was securing the scene, Officer Belew learned that a second victim was bleeding in the lobby of the Jackson Hotel.

Investigator Kevin Mooney, a crime scene analyst with the JPD's Major Crimes Division, processed the scene, photographing and collecting all evidence. In particular, Investigator Mooney collected six spent 9-millimeter shell casings, four bullet fragments, and a pair of eyeglasses.

Investigator Ron Pugh with the JPD's Violent Crimes Unit responded to the Casey Jones Motel and collected surveillance footage from the shooting. After reviewing the surveillance video footage, Investigator Pugh obtained Ms. Maness's license plate number, and she came to the police station and provided a statement in which she named the defendant and Mr. Smith as the individuals involved. Mr. Smith, who was still at Ms. Maness's apartment, was taken into custody and stated that the defendant had fled to Florida. U.S. Marshals located the defendant in Florida, and he was returned to Tennessee on October 15, 2022. Following his arrest, the defendant gave a statement in which he admitted to stabbing Mr. Woods and stealing Mr. Theus's bag. The defendant stated that he took the gun that Mr. Smith used to shoot Mr. Theus, went to Okeechobee, Florida, and threw the gun into the ocean.

The defendant declined to present evidence. Following deliberations, the jury convicted the defendant of two counts of attempted first-degree murder and one count of especially aggravated robbery, and the trial court imposed an effective sentence of twenty-three years in confinement at 100%. The defendant did not file a motion for new trial but filed a timely notice of appeal.

## *Analysis*

On appeal, the defendant argues the evidence presented at trial was insufficient to support his conviction for the attempted first-degree murder of James Theus[3]. The State contends the evidence is sufficient. Upon our review, we agree with the State.

---

[3] Although the defendant alleges in his statement of issues that "the [S]tate [did not] present sufficient evidence to support [the defendant's] conviction of attempted first[-]degree murder and especially aggravated robbery," the argument section of his brief contains no mention of his convictions for the attempted first-degree murder of Dinarric Woods or especially aggravated robbery and no rationale as to

When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Our Supreme Court has stated the following rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus, the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere, and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

At trial, the State relied on a theory of criminal responsibility. "A person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a). Criminal responsibility for the actions of another arises when the defendant, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, . . .

---

why they should be reversed. Therefore, any claim that the evidence is insufficient to support the defendant's attempted first-degree murder of Dinarric Woods or especially aggravated robbery convictions is waived. "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. Ct. Crim. App. R. 10(b); *see also* Tenn. R. App. P. 27(a)(7).

solicits, directs, aids, or attempts to aid another person to commit the offense[.]" *Id.* § 39-11-402(2). Criminal responsibility is not a separate crime but "is solely a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person." *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999).

The defendant need not physically participate in the crime in order to be criminally responsible. *State v. Phillips*, 76 S.W.3d 1, 9 (Tenn. Crim. App. 2001). "Presence and companionship with the perpetrator of a felony before and after the commission of the offense are circumstances from which one's participation in the crime may be inferred." *State v. Ball*, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998). "No particular act need be shown. It is not necessary for one to take a physical part in the crime[;] [m]ere encouragement of the principal is sufficient." *Id.* The defendant must "knowingly, voluntarily and with common intent unite with the principal offenders in the commission of the crime." *State v. Foster*, 755 S.W.2d 846, 848 (Tenn. Crim. App. 1988).

Moreover, under the doctrine of criminal responsibility, a person is liable not only for the target offense, but also for offenses committed by a confederate that were the natural and probable consequences of the target offense. *State v. Stokes*, No. E2023-00667-CCA-R3-CD, 2024 WL 2032847, at *5 (Tenn. Crim. App. May 7, 2024), *perm. app. denied* (Aug. 13, 2024) (citing *State v. Howard*, 30 S.W.3d 271, 276 (Tenn. 2000)). Whether an offense was a natural and probable consequence of the target offense is a question for the jury as the finder of fact. *Id.* The principle behind the rule is "based on the recognition that aiders and abettors should be responsible for the criminal harms they have naturally, probably[,] and foreseeably put into motion." *Id.* To demonstrate liability, the State must prove the following beyond a reasonable doubt: "(1) the elements of the crime or crimes that accompanied the target crime; (2) that the defendant was criminally responsible pursuant to Tennessee Code Annotated section 39-11-402; and (3) that the other crimes that were committed were natural and probable consequences of the target crime." *Id.*

The defendant was convicted of the attempted first-degree murder of James Theus. First-degree murder is "a premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). In this context, premeditation is "an act done after the exercise of reflection and judgment." *Id.* § 39-13-202(d). Tennessee Code Annotated section 39-13-202(d) further states:

> "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free

from excitement and passion as to be capable of premeditation.

*Id.* "The element of premeditation is a question for the jury which may be established by proof of the circumstances surrounding the killing." *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006) (citing *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997)). The Tennessee Supreme Court has identified certain factors which tend to support a finding of premeditation, including: "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime, and calmness immediately after the killing." *Bland*, 958 S.W.2d at 660 (citing *State v. Brown*, 836 S.W.2d 530, 541-42 (Tenn. 1992); *State v. West*, 844 S.W.2d 144, 148 (Tenn. 1992)). *Bland* does not include an exhaustive list of factors for consideration when finding premeditation. *State v. Adams*, 405 S.W.3d 641, 663 (Tenn. 2013). A conclusion that the killing was premeditated may also be supported by the nature of the killing or evidence establishing a motive. *Id*. Likewise, lack of provocation by the victim, failure to render aid, and destruction or secretion of evidence may also support an inference of premeditation. *State v. Larkin*, 443 S.W.3d 751, 815-16 (Tenn. Crim. App. 2013) (internal citations omitted).

Criminal attempt occurs when a person "acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." *Id.* § 39-12-101(a)(3). To qualify as a "substantial step," the person's "entire course of action" must be "corroborative of the intent to commit the offense." *Id.* § 39-12-101(b).

Here, the defendant does not dispute that Mr. Smith shot the victim. Instead, the defendant argues the State failed to establish that he acted with premeditation. Specifically, the defendant contends that the shooting was a reaction to the defendant's sexual assault earlier that night and, therefore, was a result of passion and not premeditation. The State contends the evidence was sufficient to support the jury's determination, and we agree.

In the light most favorable to the State, the evidence established that the defendant and his friends met Mr. Theus and Mr. Woods at the Mobil station and followed them to the Casey Jones Motel to smoke marijuana. In the motel parking lot, Mr. Theus touched the defendant's penis, and the defendant and his friends left a few minutes later. When they arrived at Ms. Maness's apartment, the defendant was "aggravated and frustrated" at Mr. Theus, and someone retrieved Ms. Maness's gun from her bedroom. The defendant and Mr. Smith then returned to the Casey Jones Motel and spoke to Mr. Theus and Mr. Woods for fifteen minutes before Mr. Smith retrieved the gun from the defendant's vehicle

and shot Mr. Theus multiple times. Following the shooting, the defendant stole a Gucci bag from Mr. Theus's vehicle and fled to Florida where he threw the gun used by Mr. Smith into the ocean.

Looking specifically to the premeditation factors outlined by our supreme court, the record establishes the defendant and Mr. Smith obtained a gun from Ms. Maness's apartment after Mr. Theus sexually assaulted the defendant. They then returned to the Casey Jones Motel and spoke to Mr. Theus for fifteen minutes before Mr. Smith shot the unarmed victim multiple times while he was lying on the ground. Afterward, the defendant did not attempt to render aid to Mr. Theus, choosing instead to steal property from the victim's vehicle, flee to Florida, and throw the gun used by Mr. Smith in the ocean. *See Bland*, 958 S.W.2d at 660; *Larkin*, 443 S.W.3d 815-16. Accordingly, the record is sufficient to establish premeditation so as to sustain a conviction for the attempted first-degree murder of James Theus. The defendant is not entitled to relief.

### *Conclusion*

Based on the foregoing authorities and reasoning, the judgments of the trial court are affirmed.

s/ J. Ross Dyer

J. ROSS DYER, JUDGE